IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

NICOLE LEIGH THOMAS,

     Plaintiff,

v.                         CIVIL ACTION NO. 3:20-cv-00337

ANDREW SAUL,
Commissioner of Social Security,

     Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Nicole Leigh Thomas ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on May 19, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's motion for judgment on the pleadings and brief in support (ECF Nos. 13, 14) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 17).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT**

Claimant's request to reverse the Commissioner's decision (ECF No. 13), **DENY** the Commissioner's request to affirm his decision (ECF No. 17), **REVERSE** the final decision of the Commissioner, and **REMAND** this action for further proceedings.

## I. *BACKGROUND*

### A. *Information about Claimant and Procedural History of Claim*

Claimant was 35 years old at the time of her alleged disability onset date and 43 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 249, 253.)[1]  She attended college and completed vocational nursing training. (*Id.* at 278.)  Most recently, she worked at a call center, and she has also been employed as a housekeeper and a nurse. (*Id.*)  Claimant alleges that she became disabled on May 1, 2011, due to a traumatic brain injury and bipolar disorder. (*Id.* at 272, 277.)

Claimant filed her applications for benefits on February 16, 2017. (*Id.* at 21, 249–58.)  Her claims were initially denied on June 1, 2017, and again upon reconsideration on August 29, 2017. (*Id.* at 165–74, 182–95.)  Thereafter, on September 1, 2017, Claimant filed a written request for hearing. (*Id.* at 196–97.)  An administrative hearing was held before an ALJ on January 9, 2019, in Huntington, West Virginia. (*Id.* at 45–71.)  On February 21, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 18–38.)  Claimant then sought review of the ALJ's decision by the Appeals Council on April 4, 2019. (*Id.* at 15–17.)  The Appeals Council denied Claimant's request for review on April 26, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–9.)

Claimant timely brought the present action on May 14, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.)  The

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 12.

Commissioner filed an Answer (ECF No. 11) and a transcript of the administrative proceedings (ECF No. 12). Claimant subsequently filed her motion for judgment on the pleadings and brief in support (ECF Nos. 13, 14), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 17). The undersigned thereafter ordered the parties to file supplemental briefs limited to the issue of the applicability of the decision of the Fourth Circuit Court of Appeals in *Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377 (4th Cir. 2021) to this case. (ECF No. 18.) Claimant timely filed her supplemental brief (ECF No. 19), and the Commissioner timely responded (ECF No. 20). As such, this matter is fully briefed and ready for resolution.

B.  *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1.  *Mental Health Treatment During Relevant Period*

On November 12, 2014, about six weeks after the unfavorable decision on her prior claim for benefits, Claimant presented to Stacy Sheppard, PMHNP-BC ("Ms. Sheppard"), a nurse practitioner who served as her mental health treatment provider, and reported that she "spent the last 2 months in prison" after "violat[ing] her home confinement" and "was released 1 week ago." (Tr. at 598.) Claimant told Ms. Sheppard that "She doesn't think that she was given the correct dosages of medications while she was in prison" and "complain[ed] of fatigue, problems with initial insomnia, [and] high anxiety." (*Id.*) A mental status examination was normal. (*Id.* at 599.) Ms. Sheppard directed Claimant to continue using her prescribed medications and to attend psychotherapy. (*Id.* at 600–01.)

Claimant presented to her first psychotherapy session on November 24, 2014. (*Id.* at 596–97.) She returned for another session on December 4, 2014. (*Id.* at 593–95.)

One week later, on December 11, 2014, Claimant presented to Ms. Sheppard and stated that she was "doing good" and had been sober "since September," although she continued to report "problems with loss of pleasure, poor motivation, fatigue and poor concentration on a weekly basis." (*Id.* at 589.) A mental status examination was normal. (*Id.* at 590.) Ms. Sheppard instructed Claimant to continue her prescribed medications and attend psychotherapy, and she suggested "AA/NA meetings." (*Id.* at 591.) When Claimant returned to Ms. Sheppard on January 20, 2015, she reported that she "Continues to do well with recovery, and is attending several AA groups per week" while "searching for a home group," but she complained that "She will need to go to treatment ordered by the court system." (*Id.* at 585.) A mental status examination was again normal. (*Id.* at 586.) Claimant attended psychotherapy on January 30 and February 20, 2015, and at both sessions, the psychotherapist observed that Claimant's insight and judgment were impaired. (*Id.* at 580, 583.)

Claimant returned to Ms. Sheppard on February 20, 2015, and a mental status examination was normal. (*Id.* at 576.) She attended psychotherapy on March 16, 2015, and the psychotherapist observed that her mental status was normal. (*Id.* at 574.) However, at her psychotherapy session on April 2, 2015, Claimant related "family issues," and the psychotherapist noted that Claimant had "limited insight" and "fair judgment." (*Id.* at 570–71.) When Claimant next presented to Ms. Sheppard on April 29, 2015, she "report[ed] that she continues to have problems with poor concentration, forgetfulness, hyperactivity, fatigue, loss of pleasure, poor motivation and feelings of hopelessness on a weekly to monthly basis" and requested a change in her medications, but Ms. Sheppard

directed her to continue her medication regimen as prescribed and to return in one month. (*Id.* at 565.)

On September 9, 2016, Claimant presented to Ms. Sheppard and explained that she had been in prison for more than a year. (*Id.* at 1208.) Ms. Sheppard explained that Claimant "has a long history of impulsive and reckless decisions" and "a significant history of alcohol abuse." (*Id.*) She noted that Claimant "does well when she is compliant with treatment and is sober." (*Id.*) A psychiatric examination was normal. (*Id.* at 1211.) When Claimant returned to Ms. Sheppard on October 14, 2016, she related that "she continues to do well on [her prescribed medication]" but "still has problems with loss of pleasure, poor motivation, feelings of hopelessness and anxiety on a weekly basis" and "has been struggling financially." (*Id.* at 1204.) A psychiatric examination was normal. (*Id.* at 1206.) Ms. Sheppard prescribed Claimant an additional medication to address her reported insomnia. (*Id.* at 1207.) At her next appointment on February 1, 2017, Claimant told Ms. Sheppard that she had stopped taking the additional medication after two weeks. (*Id.* at 1200.) She stated that "she feels like she is in a funk." (*Id.*) A psychiatric examination was normal. (*Id.* at 1202–03.) Ms. Sheppard instructed Claimant to return in "2-3 weeks." (*Id.* at 1203.) Claimant presented to Ms. Sheppard on February 15, 2017, and reported that her medications "are working well," but she related that "She is unable to pay her rent this month which is causing a lot of anxiety." (*Id.* at 1196.) A psychiatric examination was again normal. (*Id.* at 1198–99.)

Claimant next presented to Ms. Sheppard on March 29, 2017, and reported that she had stopped using one of her medications because it caused negative side effects. (*Id.* at 1244.) She also stated that she was suffering from "increased anxiety" because she had applied for disability benefits. (*Id.*) A mental status examination was normal. (*Id.* at

1246–47.)  Claimant was prescribed a different medication.  (*Id*. at 1247.)  At her next appointment on May 3, 2017, she reported that using the medication in the morning kept her awake for three days, so she switched to taking it at night, and since then, "She now has a lot of energy, but she is sleeping well."  (*Id*. at 1248.)  Claimant also told Ms. Sheppard that "She continues to have problems with loss of pleasure, poor motivation, feelings of hopelessness and anxiety on a weekly to monthly basis." (*Id*.)  A mental status examination was normal.  (*Id*. at 1250–51.)  Claimant was instructed to continue using her medications and to return in two to three months.  (*Id*. at 1251.)  She presented to Ms. Sheppard on July 6, 2017, and stated that "she has been more irritable lately" and had been drinking again.  (*Id*. at 1234.)  A mental status examination was normal.  (*Id*. at 1236–37.)  She was directed to increase the dosage of one of her medications and return in six to eight weeks.  (*Id*. at 1237.)

On December 7, 2017, Claimant presented to Ms. Sheppard for the first time in several months and reported that she was "doing good" and "has not drank any [alcohol] since her last session."  (*Id*. at 1296.)  She also reported that "She continues to have problems with loss of pleasure, poor motivation, feelings of hopelessness and anxiety on a monthly basis, which is a good improvement since her last session." (*Id*.)  A mental status examination was normal.  (*Id*. at 1297.)  Claimant was directed to continue her prescribed medications and return in three months.  (*Id*. at 1298.)  She next presented to Ms. Sheppard on March 8, 2018, and stated that she had gotten engaged to her boyfriend and was "work[ing] as an assistant to two elderly ladies."  (*Id*. at 1302.)  She also reported that she had not been drinking alcohol and had good sleep, appetite, and energy.  (*Id*.)  She told Ms. Sheppard that she had stopped using one of her medications because although "She felt like it was working well," it later made her feel "numb."  (*Id*.)  A mental

status examination was normal.  (*Id.* at 1303.)  Claimant was directed to discontinue the medication she had already stopped using, and Ms. Sheppard suggested that Claimant increase the dosage of another medication, but Claimant declined.  (*Id.*)

Claimant returned to Ms. Sheppard on June 11, 2018, and complained of "a tremor for the last 6 months" that "worsened in the last 3 months."  (*Id.* at 1305.)  She also stated that "She feels like her mental stability is stable" and related that she had not been drinking alcohol and was still working.  (*Id.* at 1305.)  A mental status examination was normal.  (*Id.* at 1306.)  Ms. Sheppard ordered lab work and referred Claimant to a family doctor "for a medical work up."  (*Id.* at 1307.)

At her next appointment with Ms. Sheppard on October 11, 2018, Claimant reported that "Her psychiatric symptoms have exacerbated due to the grief" from her mother's sudden passing.  (*Id.* at 1362.)  She told Ms. Sheppard that she had been drinking again and was not sleeping or eating.  (*Id.*)  A mental status examination was normal.  (*Id.* at 1363.)  Ms. Sheppard prescribed a new medication and directed Claimant not to drink alcohol.  (*Id.* at 1364.)  Claimant returned to Ms. Sheppard on November 8, 2018, and reported that she was "drinking 6 beers per week" and had stopped using the new medication Ms. Sheppard prescribed because "she was too sedated and felt that her depression worsened."  (*Id.* at 1365.)  Ms. Sheppard observed that Claimant "is tearful during session today" and "continues to have relationship problems with her siblings."  (*Id.*)  A mental status examination was normal.  (*Id.* at 1366.)  Ms. Sheppard prescribed a different medication.  (*Id.* at 1367.)

2. *Opinion Evidence: Stacy Sheppard, PMHNP-BC*

On March 29, 2017, Claimant's treating mental health provider, Ms. Sheppard, completed a "Mental Residual Functional Capacity Assessment" form for her.  (*Id.* at

1219–22.)  Ms. Sheppard stated that she had treated Claimant every "1-3 months" since 2014 and that Claimant's most recent appointment was on the date she completed the form.  (*Id.* at 1219.)  Ms. Sheppard listed Claimant's diagnoses as "Severe Bipolar II," "Alcoholism," and "Epilepsy/Chronic Pain," and she gave Claimant a fair prognosis.  (*Id.*)  She gave Claimant a Global Assessment of Functioning score of 60.  (*Id.*)  Ms. Sheppard stated that Claimant had been treated through medication management and psychotherapy and was compliant with her treatment.  (*Id.* at 1219–20.)  She also affirmed that she did not believe Claimant "is a malingerer."  (*Id.* at 1219.)

Ms. Sheppard was then asked to rate Claimant's functional limitations as "None," "Mild," "Moderate," "Marked," or "Extreme."  (*Id.* at 1220.)  When asked to rate Claimant's understanding and memory, she opined that Claimant had mild limitations in her abilities to remember locations and work-like procedures, to understand and remember very short and simple instructions, and to understand and remember detailed instructions.  (*Id.*)  When asked to rate Claimant's sustained concentration and persistence, Ms. Sheppard opined that Claimant had mild limitations in her abilities to carry out very short and simple instructions and to carry out detailed instructions and moderate limitations in her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods.  (*Id.* at 1220–21.)

When asked to rate Claimant's social interaction, Ms. Sheppard opined that Claimant had mild limitations in her ability to ask simple questions or request assistance, moderate limitations in her abilities to accept instructions and respond appropriately to criticism from  supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and marked limitations in her abilities to interact appropriately with the general public and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (*Id.* at 1221.)  Lastly, when asked to rate Claimant's adaptation, Ms. Sheppard opined that Claimant had mild limitations in her abilities to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or use public transportation and marked limitations in her abilities to respond appropriately to changes in the work setting, to set realistic goals or make plans independently of others, and to tolerate normal levels of stress.  (*Id.* at 1221–22.)

When asked whether Claimant's mental impairments would "substantially interfere with [her] ability to work on a regular and sustained basis at least 20% of the time" and how often Claimant would "need to miss work each month because of [her] mental impairment[s] or for treatment of the mental impairment[s]," Ms. Sheppard wrote, "unratable." (*Id.* at 1222.)  When asked whether she believed Claimant could "work on a regular and sustained basis in light of [her] mental impairment[s]," Ms. Sheppard responded, "Patient has persistent mental illness and has been treated by undersigner [sic] for the last 3 years.  She has been incarcerated due to relapses and behavioral changes.  She will continue to have trouble [with] relapses and job security.  Multiple DUI's – 7 total." (*Id.*)  Lastly, Ms. Sheppard opined that Claimant could manage her own funds. (*Id.*)

9

*3. Vocational Expert Hearing Testimony*

During the administrative hearing, the ALJ heard testimony from a vocational expert ("VE").  (*Id.* at 65–69.)  He began his questioning of the VE by asking him to classify Claimant's past relevant work, and the VE answered that Claimant had worked as a licensed practical nurse, a telemarketer, and a housekeeper.  (*Id.* at 65–66.)  The ALJ then asked the VE to

> assume a hypothetical individual of the claimant's age, education, and work experience who's able to perform medium work; can occasionally climb ladders, ropes, and scaffolds; can frequently balance and climb ramps and stairs; must avoid concentrated exposure to extreme cold, extreme heat, noises, vibrations, irritants such as fumes, dust, odors, gases, and poorly ventilated areas and hazards such as moving machinery and unprotected heights; the individual can frequently handle and finger with both hands; the individual cannot keep up with fast-paced production work such as work with rigid hourly quotas; is limited to simple four to five-step instructions; can have occasional changes in the work setting; and can occasionally interact with the public, coworkers, and supervisors.

(*Id.* at 66–67.)  He asked the VE if the hypothetical individual could perform any of Claimant's past work, and the VE responded that she could not.  (*Id.* at 67.)  When asked if the hypothetical individual could perform "any unskilled jobs," the VE answered that "there are jobs at the medium, light, and sedentary levels."  (*Id.*)  He identified night cleaner and laundry worker at the medium exertional level, routing clerk and price marker at the light exertional level, and inspector and sorter at the sedentary exertional level.  (*Id.*)

The ALJ next asked the VE to imagine a second hypothetical individual with the same limitations as the first but who "is also going to be off task at least 20% of each workday." (*Id.* at 68.) The ALJ continued, "I'm assuming that eliminates all work including past work?" (*Id.*) The VE answered in the affirmative. (*Id.*)

The ALJ then offered Claimant's representative an opportunity to question the VE. (*Id.*) Claimant's representative asked the VE to reference "the first hypothetical" and "add[] a marked limitation on the ability to interact with the general public; a marked limitation on the ability to maintain socially-appropriate behavior; marked limitation on the ability to respond appropriately to changes in the work setting; marked limitation on the ability to set realistic goals or make plans; and a marked limitation on the ability to tolerate normal levels of stress." (*Id.*) He asked the VE, "I take it past work is still eliminate [sic], but are there other jobs in the national economy?" (*Id.*) The VE requested that Claimant's representative define "markedly limited," and Claimant's representative responded, "I would say it would be highly infrequently." (*Id.*) The VE then stated that "there wouldn't be any jobs the person could perform." (*Id.* at 68–69.)

The ALJ concluded by asking the VE if his testimony was consistent with the *Dictionary of Occupational Titles*. (*Id.* at 69.) The VE answered, "It is in all respects . . . except the mental limitations are not covered in the [*Dictionary of Occupational Titles*] to that significant level so my testimony in that area is based upon my educational background and my work experience and resources that I use from the Department of Labor and Skill Tran Corporation." (*Id.*)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

13

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding

14

to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements through December 31, 2018. (Tr. at 24.) He further determined that Claimant had not engaged in substantial gainful activity since September 27, 2014, the date after the final decision on her prior claims for benefits. (*Id.*; *see id.* at 21.) He found that Claimant's "history of skull fracture and closed head injury; hearing loss, status-post right tympanoplasty; tremor; convulsive disorder; bipolar disorder; generalized anxiety disorder; and history of alcohol and marijuana abuse" constituted "severe" impairments. (*Id.* at 24–25.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 25–27.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform a limited range of medium work" and could occasionally climb ladders, ropes, and scaffolds and frequently balance, climb ramps and stairs, and handle and finger with both hands. (*Id.* at 27.) He further found that she "must avoid concentrated exposure to extreme cold; extreme heat; noise; vibrations; irritants such as fumes, dust, odors, gases, and poorly ventilated areas; and hazards such as moving machinery and unprotected heights." (*Id.*) In addition, the ALJ determined that Claimant "cannot keep up with fast-paced production work such as work with rigid hourly quotas" and could handle only "simple, four-to-five step instructions" and only "occasional changes in the work setting." (*Id.*) He

also found that "She can occasionally interact with the public, co-workers, and supervisors." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 31.) He noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of medium work, he enlisted a VE to aid in his finding that Claimant is capable of working as a night cleaner, laundry worker, routing clerk, price marker, inspector, or sorter. (*Id.* at 32.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from September 27, 2014, through the date of this decision." (*Id.*)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that

of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant argues that the ALJ should have adopted the opinion of her treating mental health provider, Ms. Sheppard, that her mental impairments satisfy Listing 12.04.  (ECF No. 14 at 7–10.)  She further asserts that because he did not give adequate weight to Ms. Sheppard's opinions, his hypothetical questions to the VE do not accurately reflect Claimant's functional limitations.  (*Id.* at 10–12.)  Claimant asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ.  (*Id.* at 13.)  The Commissioner responds that the ALJ properly evaluated Ms. Sheppard's opinions and that his decision not to incorporate those opinions in his RFC assessment is supported by substantial evidence.

### A.  Ms. Sheppard's Opinions

Claimant contends that the ALJ erred by rejecting Ms. Sheppard's opinions that Claimant had marked limitations in several functional areas, which would require a finding that her mental impairments satisfy Listing 12.04.  (ECF No. 14 at 7–10.)  When determining whether a claimant is disabled, the ALJ must "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam); *see* 20 C.F.R. §§ 404.1527(c), 416.927(c).  Generally, "a

treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, as the ALJ acknowledged, Ms. Sheppard's opinions are not subject to this "treating physician rule" because, as a nurse practitioner, she "is not an acceptable medical source" under the applicable regulations. (Tr. at 29.) *Williamson v. Berryhill*, No. 8:16-cv-02915-TMC-JDA, 2018 WL 3133417, at *9 (D.S.C. Jan. 30, 2018), *adopted by* 2018 WL 1166097 (D.S.C. Mar. 6, 2018); *Slowik v. Comm'r of Soc. Sec.*, No. BPG-11-1698, 2012 WL 3610774, at *2 (D. Md. Aug. 21, 2012); *see* 20 C.F.R. §§ 404.1502(a), 416.902(a) (defining "acceptable medical source" in part as a licensed physician or psychologist); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.").

The ALJ must nonetheless evaluate the opinions of "medical sources who are not acceptable medical sources" by considering the factors enumerated above, but "not every factor for weighing opinion evidence will apply in every case." 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1). In doing so, he must "explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow [his] reasoning." *Id*. §§ 404.1527(f)(2), 416.927(f)(2). He did not adequately do so here. After listing Ms. Sheppard's opinions, he explained that he gave them "little weight, as the limitations given are excessive and inconsistent with the overall objective evidence of record, as well as Ms. Sheppard's treatment notes." (Tr. at 29.) The ALJ provided no

further reasoning to support his conclusions and did not specifically identify the record evidence that he found to be inconsistent with Ms. Sheppard's opinions.  (*Id.*)  Although he referenced one exhibit containing several years of Ms. Sheppard's treatment notes, in his review of the medical evidence of record, he cited to the treatment notes from only one appointment during that nearly six-year span.  (*Id.* at 28–29.)  Of course, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)).  But he must provide "a discussion of which evidence [he] found credible and why."  *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (citing *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989)).

Stated another way, "[w]hile an ALJ is under no obligation to accept any medical opinion, he must nevertheless explain the weight accorded such opinions."  *Mason v. Colvin*, No. 4:13-cv-00093-D, 2014 WL 4162788, at *5 (E.D.N.C. July 29, 2014) (internal citations omitted); *see Farris v. Berryhill*, No. 2:17-cv-02051, 2018 WL 2175884, at *3 (S.D.W. Va. May 11, 2018) ("Courts cannot determine if findings are unsupported by substantial evidence unless the [ALJ] explicitly indicates the weight given to all of the relevant evidence.  This is especially true for the opinions of treating physicians." (internal quotation marks and citations omitted)).  Because he did not do so in this case, the undersigned **FINDS** that the ALJ erred in his evaluation of Ms. Sheppard's opinions. However, the undersigned does not suggest that those opinions are entitled to significant weight, or any weight at all, only that the ALJ must better explain the weight he chooses to give to them.

B. *VE Hypotheticals*

Claimant also argues that because the ALJ did not accept Ms. Sheppard's opinions, his RFC assessment and corresponding hypothetical questions to the VE are deficient. (ECF No. 14 at 10–12.)  This contention may be appropriately addressed on remand. However, to the extent Claimant asserts that the ALJ's hypothetical questions to the VE were improper, she is mistaken.  The ALJ's hypothetical questions to the VE "need only incorporate those limitations which are credibly established in the record."  *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)); *see Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." (quoting *Walker*, 889 F.2d at 50)).  In this case, the ALJ and Claimant have reached different conclusions about which limitations were "credibly established."  That does not inherently render the ALJ's hypothetical questions to the VE improper, as Claimant seems to suggest.

The ALJ may present alternative hypotheticals to the VE, "even if they are contradictory," and may "determine after the hearing which hypothetical is supported by the record evidence."  *Hart v. Berryhill*, No. 5:18-cv-208-D, 2019 WL 1759741, at *6 (E.D.N.C. Mar. 26, 2019) (quoting *Woodlief v. Berryhill*, No. 5:16-cv-191-FL, 2017 WL 9478528, at *5 (E.D.N.C. Aug. 4, 2017), *adopted by* 2017 WL 4164076 (E.D.N.C. Sept. 20, 2017)).  To that end, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ."  *Farnsworth v. Astrue*, 604 F. Supp. 2d 828,

858 (N.D.W. Va. 2009) (report and recommendation of magistrate judge) (quoting *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000)). The hypothetical questions presented to the VE are not factual findings and do not bind the ALJ when asked. *Davis v. Apfel*, 162 F.3d 1154 (4th Cir. 1998) (per curiam) (table), 1998 WL 559728, at *2 (stating that hypothetical questions that alternatively included claimant's subjective complaints and did not include them "were entirely proper" because hypothetical not equivalent to "findings of fact"). Insofar as Claimant suggests otherwise, her assertion is incorrect. Accordingly, the undersigned **FINDS** that the ALJ's hypothetical questions to the VE were permissible.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request to reverse the Commissioner's decision (ECF No. 13), **DENY** the Commissioner's request to affirm his decision (ECF No. 17), **REVERSE** the final decision of the Commissioner, and **REMAND** this action for further proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: May 5, 2021

Dwane L. Tinsley
United States Magistrate Judge